Joseph SCOPAZ and Mile Peros,
Appellees,

v.

S. S. SANTA LUISA and Grace Line,
Inc., Appellant.

No. 285, Docket 30851.

United States Court of Appeals
Second Circuit.

Argued Jan. 11, 1967.

Decided Jan. 30, 1967.

1. The action by Scopaz was originally
brought at law, but was later transferred

Louis J. Gusmano, New York City
(James B. Magnor, Vernon S. Jones,
Charles N. Fiddler, Kirlin, Campbell &
Keating, New York City, of counsel), for
appellant.

Chester A. Hahn, New York City (Sylvia Miller, New York City, of counsel),
for appellee, Joseph Scopaz.

Jack Steinman, New York City, for
appellee, Mile Peros.

Before WATERMAN, SMITH and
KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit
Judge:

The sole issue presented by this appeal
is whether a longshoreman, in the direct
employ of a shipowner, may sue the latter
for injuries suffered as a result of the
ship's unseaworthy condition, or whether § 5 of the Longshoremen's and Harbor Workers' Compensation Act (Longshoremen's Act), 33 U.S.C. § 905, provides a longshoreman with his exclusive
remedy.

Our task has been simplified by the
parties' stipulation on the facts and the
issue of damages. Briefly stated, Joseph
Scopaz and Mile Peros (appellees), both
longshoremen, were injured while in the
direct employ of appellant, Grace Lines,
Inc. (Grace). Scopaz sustained his injuries aboard the SS SANTA ANNA
when the top rung of the ladder he was
descending became detached, causing him
to fall into the hold below. Peros was
injured while storing cargo on the SS
SANTA LUISA. The space between seatainers stored in the hold of the ship had
not been bridged with dunnage boards,
and Peros accidentally stepped into the
hiatus and fell a distance of 8 feet.

Appellees brought their present actions
in the District Court to recover damages
for the injuries they sustained.[1] Grace

by stipulation and order from the civil
side of the District Court to the ad-

candidly stipulated that the SANTA ANNA and the SANTA LUISA were unseaworthy at the time the accidents occurred, and that this condition was the proximate cause of appellees' injuries. The only determination left for Judge Murphy was whether § 5 of the Longshoremen's Act provided appellees with their exclusive remedy. All parties moved for summary judgment; the judge denied Grace's motion and granted motions of Scopaz and Peros,[2] and from this grant Grace appeals.

■ Section 5 of the Longshoremen's Act provides in relevant part:

> The liability of an employer * * * shall be exclusive and in place of * * all other liability * * * to the employee * * * and anyone otherwise entitled to recover damages from such employer * * * at law or in admiralty * * *.[3]

It would appear at first blush that since Grace clearly is the appellees' "employer,"[4] the Act would bar the instant suits. But, a careful analysis of the apposite cases leads us to the conclusion that Judge Murphy properly granted summary judgment against Grace.

In Reed v. The YAKA, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), the pivotal case in this area, a libel *in rem* was filed by Reed, a longshoreman, against the ship to recover for injuries suffered while unloading the vessel. The YAKA's owner, Waterman Steamship Company (Waterman), brought in, as an additional party, Pan-Atlantic Steamship Corporation (Pan-Atlantic), the operator of the ship under a bareboat charter at the time of the accident. The district judge found the YAKA unseaworthy, and allowed Reed to recover against the ship. The judge also decided that Waterman could recover against Pan-Atlantic under the indemnity clause in the bareboat charter agreement. 183 F.Supp. 69 (E.D.Pa.1960).

On appeal, the Court of Appeals for the Third Circuit reversed this holding and decided that neither Waterman nor Pan-Atlantic was liable *in personam* for the unseaworthiness, and that a libel *in rem* against the ship could not properly be sustained unless there was an underlying personal liability. 307 F.2d 203 (1962). But the Supreme Court in turn reversed the Court of Appeals and held that Pan-Atlantic was liable *in personam* for the unseaworthiness of the ship. The Court recognized that the law of admiralty ordinarily treats a bareboat charterer as if

---

miralty docket. Peros brought 2 actions, one at law against Grace, and a separate suit in admiralty against Grace *in personam* and *in rem* against the SS SANTA LUISA.

2. Judgment was entered in favor of the appellees, awarding them damages in the amounts agreed upon in the stipulations. Grace was ordered to pay Scopaz $50,-000 with interest at 6% on $45,992.18. It was provided, however, that $4,007.82, previously paid to appellee as statutory benefits under the Longshoremen's Act, be withheld by Grace. Peros was awarded $28,350 with interest at 6% on $19,-593.74. Grace withheld $8,756.26, the sum it had already paid appellee under the Act.

3. The section goes on to provide that:
   [I]f an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. * * *
   The parties stipulated that Grace had at all times insured its liabilities under the Act, and had otherwise complied with its terms. Pursuant to the Act, Grace paid the appellees benefits for temporary total and temporary partial disability, and for their hospital and medical expenses. See note 2, supra.

4. The Act defines an "employer" as one "whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States * * *." 33 U.S.C. § 902(4). The term "employee" is defined negatively as "not * * * [including] a master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." 33 U.S.C. § 902 (3). There is no controversy as to whether appellees are "employees" within the meaning of the Longshoremen's Act.

it were the owner, and indeed it is generally referred to as the owner *pro hac vice*. The majority opinion, authored by Mr. Justice Black, concluded that a bareboat charterer can be held liable *in personam* for the unseaworthiness of a chartered vessel in the absence of an explicit statutory exemption. The only question remaining for resolution, therefore, stated the Court, "is whether the Longshoremen's Act prevents recovery by petitioner [Reed] for Pan-Atlantic's breach of its warranty of seaworthiness." 373 U.S. 413, 83 S.Ct. 1352. The response to this query was in the negative. Justice Black observed that the Court's decision in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), already had determined that a shipowner's warranty of seaworthiness extended to a longshoreman injured while unloading a ship, even though he was employed by an independent stevedore—a decision based in large measure on the "humanitarian policy" of the doctrine of seaworthiness, and the view that in passing the Longshoremen's Act, Congress had not intended to eliminate the traditional remedies of the sea.

It was apparent, therefore, that under the *Sieracki* doctrine, even if Reed had been employed by an independent stevedore rather than directly by the owner *pro hac vice*, he could have recovered from the owner for the injuries he suffered. It would be disingenuous, the Supreme Court concluded, to permit this right of recovery to be lost merely because the owner was also the longshoreman's employer and compensation was available under the Longshoremen's Act.

Justice Black elaborated on his *ratio decidendi* in the following terms:

[A] shipowner's obligation of seaworthiness cannot be shifted about, limited, or escaped by contracts or by the absence of contracts * * *. [T]he shipowner's obligation is rooted, not in contracts, but in the hazards of the work. * * * [O]nly blind adherence to the superficial meaning of a statute could prompt us to ignore the fact that Pan-Atlantic was not only an employer of longshoremen but was also a bareboat charterer and operator of a ship and, as such, was charged with the traditional, absolute, and nondelegable obligation of seaworthiness which it should not be permitted to avoid. We have previously said that the Longshoremen's Act "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." We think it would produce a harsh and incongruous result, one out of keeping with the dominant intent of Congress to help longshoremen, to distinguish between liability to longshoremen injured under precisely the same circumstances because some draw their pay directly from a shipowner and others from a stevedoring company doing the ship's service. Petitioner's need for protection from unseaworthiness was neither more nor less than that of a longshoreman working for a stevedoring company. 373 U.S. at 414–415, 83 S.Ct. at 1353. (footnotes omitted).

This reasoning and the Court's decision in *The YAKA* are clearly dispositive of the question presented to us. Grace was under a duty to provide a seaworthy ship. It is certain that if Scopaz and Peros had been employed by an independent stevedore, they could have recovered damages from Grace for the injuries they suffered as a result of its ships' unseaworthy condition. The need for protection from unseaworthiness does not diminish merely because of the fortuitous circumstances of one's technical employment. It is too late in light of *The YAKA* and the extensions of coverage under the general Maritime Law by the Supreme Court, to hold that Grace can avoid these far-reaching developments and escape its duty to provide a seaworthy vessel, merely by direct hiring of its own longshoremen.

Grace, however, urges us to distinguish *The YAKA* from the present case. It submits the interesting argument that the Supreme Court's opinion should be read narrowly as merely holding that where an employer (Pan-Atlantic) is in-

directly liable to a longshoreman for damages because of its duty to indemnify the shipowner,[5] the employer may be liable directly to its employee. In the present case, appellant says, the three party situation found in *The YAKA* does not exist. Grace's syllogistic argument is that the employer's liability, rather than being based on a duty to indemnify, as it was in *The YAKA,* runs directly to the employees, and thus our interpretation of *The YAKA* is faulty.

We believe that Grace's interpretation of *The YAKA* holding is grounded on a misreading of that decision. The Supreme Court did not decide that Waterman (the shipowner) was liable for unseaworthiness. "Whether a bareboat charter absolves the owner from liability on its warranty of seaworthiness is a question * * * we do not reach * * *." 373 U.S. at 411 n. 1, 83 S.Ct. at 1351. Thus, it is clear that Reed's right to sue Pan-Atlantic (his employer and owner *pro hac vice)*, was not based on any hypothesis that Pan-Atlantic had a duty to indemnify Waterman, if the latter were liable because of the ship's unseaworthy condition. "The only question," the Court stated, "is whether the Longshoremen's Act prevents recovery by petitioner for Pan-Atlantic's breach of *its* warranty of seaworthiness." 373 U.S. at 413, 83 S.Ct. at 1352 (emphasis added). In the clearest terms the Court concluded that § 5 of the Longshoremen's Act did not prevent an employee from suing his employer for breach of the warranty of seaworthiness, when his employer was also the owner of the vessel.

Nor do we see any merit in the attempted distinction that Reed did not sue his employer *in personam,* but rather brought an *in rem* action against *The YAKA.* The Supreme Court determined that Reed "was not barred by the Longshoremen's Act from relying on *Pan-Atlantic's liability as a shipowner for the YAKA's unseaworthiness* in order to support his libel in rem against the vessel." 373 U.S. at 415–416, 83 S.Ct. at 1353 (emphasis added). Thus, the crux of the opinion in *The YAKA* was the employer's *in personam* liability to its employees.

We have considered appellant's other arguments and find them equally devoid of any merit.[6] In sum, we view appellant's contention as an attack upon the holding in *The YAKA;* such arguments, however, should be addressed to Congress and not to this Court.[7]

Affirmed.

---

5. In Ryan Stevedoring Co. v. Pan-Atlantic SS Co., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Supreme Court held that where an injured longshoreman recovered damages from the shipowner for breach of the warranty of seaworthiness, the shipowner could assert the stevedore's contractual liability to it, and recover indemnity. Even in the absence of an express agreement for indemnity, the stevedore was liable over to the shipowner for breach of its promise to store the cargo safely.

6. Appellant relies, for example, on several Supreme Court cases which have held that certain compensatory schemes under which the federal government is liable, are exclusive. See Johansen v. United States, 343 U.S. 427, 72 S.Ct. 849, 96 L. Ed. 1051 (1952); Patterson v. United States, 359 U.S. 495, 79 S.Ct. 936, 3 L.Ed. 2d 971 (1959); United States v. Demko,

385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966). But the considerations are quite different when the government is involved rather than a private individual. As the Supreme Court noted in the Johansen case, "a comprehensive plan for waiver of sovereign immunity, in the absence of specific exceptions, would naturally be regarded as exclusive." 343 U.S. at 440, 72 S.Ct. at 857.

7. We are not alone in our interpretation of the Supreme Court's holding in *The YAKA.* Every court that has been asked to apply that decision to facts similar to those presented to us has concluded that § 5 of the Longshoremen's Act does not bar a suit against the shipowner-employer. See, e. g., Pacific Inland Nav. Co. v. Course, 368 F.2d 540 (9th Cir. 1966); Hertel v. American Export Lines, 225 F.Supp. 703 (S.D.N.Y. 1964).